# CHARLESTON.

## R. L. BELKNAP v. BALTIMORE & OHIO RAILROAD CO.

### Submitted February 20, 1917.   Decided February 27, 1917.

1. CARRIER—*Carriage of Goods—Delivery and Acceptance.*

    A carrier is bound to deliver goods entrusted to it for shipment, at the place of destination named in the contract, and cannot compel the owner to accept them elsewhere.   (p. 695).

2. SAME—*Carriage of Goods—Delivery—Warehousing—Reshipment.*

    Even though a consignee of goods does not call for them within such time after arrival as will prevent expiration of the carrier's liability therefor as carrier, the latter is bound to hold them at the place of destination, as a warehouseman, for a reasonable time; and its unauthorized reshipment thereof from such place is wrongful and imposes absolute liability for their loss in the unauthorized transit and custody.   (p. 695).

3. SAME—*Carriage of Goods—Charges—Liability for Loss.*

    Charges founded upon a wrongful reshipment of goods from their destination after delivery there, are illegal, and detention of the goods, on their return to the place of destination, for nonpayment thereof, is wrongful and subjects the carrier to absolute liability for loss thereof, occurring within the period of such detention.   (p. 696).

4. SAME—*Carriage of Goods—Reshipment—Notice—Liability for Loss.*

    A carrier's unauthorized and wrongful removal of goods from their place of destination, after delivery there, imposes upon it duty to notify their owner of the probable date of return thereto, and omission of such duty subjects the carrier to absolute liability for loss of the goods, occurring between the dates of their return and the owner's knowledge thereof.   (p. 698).

5. SAME—*Carriage of Goods—Notice to Consignee.*

    In such case, the general rule absolving the carrier from duty to notify the consignee of the arrival of goods at their place of destination and making it his duty to await their arrival and inquire about it, does not apply.   To make it applicable, the carrier must give notice of the date of the return shipment.   (p. 698).

6. APPEAL AND ERROR—*Harmless Error—Rulings at Trial.*

    If no verdict other than the one found and returned on the trial of a case would be consistent with the law applicable to the clearly established facts of the case, errors in rulings made in the progress of the trial are deemed harmless, and a new trial will not be granted on account thereof.   (p. 699).

Error to Circuit Court, Braxton County.

Action by R. L. Belknap against the Baltimore & Ohio Railroad Company. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*Haymond & Fox,* for plaintiff in error.

*Hines & Kelly,* for defendant in error.

POFFENBARGER, JUDGE:

This writ of error seeks review of a judgment for $322.73, rendered on a verdict of a jury, in an action of assumpsit for the value of certain property of the plaintiff, entrusted to the defendant, a common carrier, for transportation, in the manner hereinafter stated, and alleged to have been lost by a breach of the contract of carriage, damages to other property shipped with it and delivered and deprivation of use of all the property, occasioned by delay in transportation and delivery.

The property in question was a saw-mill and machinery and appliances used in connection with it. Having loaded them in an open car of the Chesapeake & Ohio Railway Co., the initial and connecting carrier, at Peytona, Boone County, the plaintiff took a bill of lading, showing consignment thereof to himself at Erbacon, Webster County, West Virginia. The property was described in the bill of lading as follows: "1 car saw mill machinery." In addition to the larger pieces of machinery constituting the mill proper, there were a great many small articles in the car, such as wrenches, dies, cold-chisels, bolts, taps, saw-teeth, guides, boxings, a square, a hand-saw, a shovel, saw swedges, log trucks, an equalizing saw, belts, governors, pulleys, lubricators and whistles. Some of these, valued at about $190.00, were lost. The bill of particulars charges $10.00 for breakage, $7.73 for wrongful storage charges, $15.00 for expense of reloading, alleged to have been wrongfully caused by the defendant, $100.00 for damages to the machinery by exposure to the weather and $200.00 as damages by deprivation of the use thereof.

The mill was shipped to Erbacon for use in the manufacture of some timber into wine and oil barrel staves, under a contract between the brother of the plaintiff and a firm known as Taylor and Messenger, at a point near a log-railroad, known as the Davis and Eaken road and connecting with the Baltimore and Ohio Railroad at Erbacon. The contract required the mill to be on the siding of the Davis and Eaken railroad by March 1, 1914, and Taylor and Messenger were to furnish teams and drivers to haul it to the mill site, The car containing the machinery arrived at Erbacon, April 9, 1914. That point was the destination named in the bill of lading, the initial carrier having refused to bill it through to its destination on the Davis and Eaken road. Soon after its arrival, the Baltimore & Ohio Railroad agent at Erbacon sent it to Birch River, but it promptly came back; and, after some days, not a great many, on the suggestion of P. E. Eaken and without authority from the consignee and owner, he sent it to Sutton, West Virginia. It arrived at Sutton, April 21, and the agent at that point, having been advised by a Mr. Ott Rader that the consignee, R. L. Belknap, resided at Gassaway, he mailed him a postal card telling him it was there. Being absent from home and in Boone County, Belknap did not receive the card for sometime, and, when he went to Sutton to see about the mill, it had been shipped to Clarksburg for storage. As to how long it remained at Sutton, the evidence is very indefinite, the agent saying he does not know how long it was there. There is a suggestion in the record that it remained there about forty days. Through the superintendent at Grafton, the plaintiff procured reshipment to Erbacon and it arrived there July 10, 1914, subject to a charge for storage which the plaintiff considered unjust and exorbitant, and it remained there until September 12. At that point, the car stood on the siding for a week or ten days, and then the machinery was unloaded and placed on the ground, on the railroad company's right of way, and imperfectly covered with tin roofing which constituted a part of the shipment.

The shipment of the car to Sutton was occasioned by the accidental interference of Rader and the error of the defend-

ant's agent in acting upon his representation made through
Eaken. He was a timber and mill man operating in the re-
gion around Erbacon, and, at about the time of the arrival
of Belknap's mill at that place, he was expecting shipment
of a part of one of his mills from some place in Pennsylvania
to Erbacon. In fact, he had a mill and part of a mill coming
from Pennsylvania, the complete one to Bison and the part
of one to Erbacon. When Belknap's mill arrived at Erbacon,
somebody came and told him his mill was at that point, and
he sent word to the agent by Eaken, to ship it to Sutton.
Afterwards, he called up the agent at Sutton and ascertained
from him that the mill belonged to Belknap, whereupon he
informed the agent that Belknap lived at Gassaway.

As to when Belknap had notice of the return of the car
to Erbacon, the evidence is very indefinite. As late as Au-
gust 10, 1914, he wrote the agent at that point, a letter of
inquiry as to its location, and stated that he had understood
it had been rebilled from Erbacon to Sutton and then taken
to Clarksburg, and that the agent at Clarksburg had writ-
ten him that it had been rebilled to Erbacon. On August
31, 1914, he took a letter from the agent at Sutton to the su-
perintendent at Grafton, saying it had been at his station un-
claimed for forty days. Though he does not give the date
of the period through which it remained there, it antedated
the shipment to Clarksburg, and must have been in April and
May. Before he went to Grafton, taking this letter with
him, he had been at Erbacon to see about the mill, and this
trip must have been made between August the 10th and
August 31st. The authorities at Grafton agreed to reduce
the charges and he paid the reduced bill, under protest, Sep-
tember 12, 1914, regarding it as being still excessive. Ac-
cording to a bill dated July 21, 1915, the charges amounted
to more than $150.00. He says he paid something over
$100.00, but there is a receipt in the record for $93.52.

The time intervening between the first arrival at Erbacon
and the unauthorized reshipment to Sutton and the loose-
ness or inadequacy of the arrangement made with Taylor
and Messenger for acceptance of the mill on behalf of the
owner, are unduly emphasized in the argument. The deliv-

ery made at the point of destination which, after a reasonable time, would have reduced the liability of the carrier to that of a warehouseman, in the event of failure of the owner to call for the mill in a reasonable time, was broken up and destroyed by the unauthorized reshipment. Notwithstanding the relaxation of the high duty of the carrier effected by termination of carriage and deposit of the property at the place of destination, it still remained under duty to keep it at that point for actual delivery into the hands of the owner, or his agent, upon application therefor. If goods are not called for on arrival, it is the duty of the carrier to store them until called for, or until they are sold, in conformity with law, for satisfaction of its charges. *I & St. L. R. Co.* v. *Herndon et als.*, 81 Ill. 143. If right to take up the mill and send it to another place, for proper storage, in default of such application, be conceded, it was not sent away for that purpose. It was reshipped by mistake, and, yet, by a wrongful act. The company was bound to keep it at Erbacon for a reasonable time. Before the owner was located or identified and without any diligent effort to identify him, it was sent to another point, at the suggestion of a total stranger to it. The reshipment was made, therefore, in consequence of the carelessness of the carrier's agent. He had no right to act upon the information given by Eaken, for he does not even say Eaken represented himself to be the agent of Belknap. His testimony is that Eaken told him Rader and the Belknap boys were partners or something to that effect, and that they had a set to saw at Sutton. Moreover, if his informant had professed agency for the consignee, he would have acted upon the representation at his peril. He could not take Eaken's word for that. *Rosendorf* v. *Poling*, 48 W. Va. 621; *Dyer* v. *Duffy*, 39 W. Va. 149.

The contract of shipment bound the carrier to deliver the goods at the place or station agreed upon. The owner could not be required to accept them elsewhere. Moore on Carriers, p. 238; Elliott on Railroads, sec. 1519; *Arthur* v. *Railroad Co.*, 38 Minn. 95; *Black* v. *Ashley*, 80 Mich. 90; *Bank* v. *Champlain &c. Co.*, 60 Vt. 62. As the defendant could not compel the plaintiff to accept his property from it at any

place other than Erbacon, the withdrawal thereof from that place and shipment to another, whether before or after the high duty of carrier was reduced to that of warehouseman, effected a destruction of the delivery made and necessarily restored the relation of shipper and carrier. Having taken the property away from the place of destination, after delivery there, the carrier must necessarily be deemed to have restored or resumed the carriage, and placed itself in substantially the same situation as if it had deviated from the route of shipment and so occasioned a delay of delivery. In as much as an unnecessary and unjustifiable deviation is wrongful and constitutes a breach of the contract of carriage, the carrier's liability for loss incurred in the deviation, is even heavier than that incurred while he is acting within his contract. He is then liable even though the loss is occasioned by an act of God or any other cause. Hutchinson On Carriers, sec. 294; *Powers* v. *Davenport,* 7 Blackf. 497; *Railway Co.* v. *Dunlap,* 80 Pac. Rep. 34; *Louisville & N. R. Co.* v. *Odill et al.,* 33 S. W. (Tenn.) 611; *Davis* v. *Jarret,* 7 Bing. 716. In the case last cited, Tindal C. J. said: ''We think the real answer to the objection is that no wrong-doer can be allowed to apportion or qualify his own wrong; and that as a loss has actually happened while this wrongful act was in operation and force, and which is attributable to his wrongful act, he cannot set up as an answer to the action the bare possibility of a loss if his wrongful act had never been done.'' The plaintiff's goods, while under shipment to Sutton and Clarksburg and back to Erbacon, were in the custody of the defendant at places at which it could not require him to accept them, and were also held in violation of the contract of shipment, for carriage beyond Erbacon was unauthorized. For any loss that may have occurred, under these circumstances, the defendant is manifestly liable.

The charges of freight from Erbacon to Sutton, Sutton to Clarksburg and Clarksburg to Erbacon, and demurrage at Sutton and Clarksburg, subject to which the property was redelivered at Erbacon, its place of destination, were founded upon the defendant's own wrongful act, and were, therefore, wholly illegal and unjustifiable, and there could have been

no lien for them. They had no foundation other than the wrongful act constituting a palpable departure from the contract. • The withholding of the property from the consignee, for payment of such charges, was just as wrongful and illegal as the transportation thereof from Erbacon to Sutton and thence to Clarksburg and back to Erbacon. If these charges had been made under the contract and not wholly without and beyond it, as in the case of reasonable doubt as to their validity or amount, the shipper might be deemed impliedly to have assented to their custody by the carrier, pending adjustment of the charges, and the latter would then have been chargeable with duty as a warehouseman, for both parties to the contract must necessarily have contemplated such a controversy. But, if property is withheld by a carrier and delivery thereof is refused, for non-payment of manifestly illegal charges, it is impossible to perceive any ground upon which the detention can be justified or deemed to be legally right. The shipper cannot be supposed to have impliedly assented to that. It is perfectly obvious that the detention of the property, after its return to Erbacon, for non-payment of charges based upon departure from the contract, is of the same character as the wrongful act for which charges were made, the departure itself, and that it was an illegal act. No plea of ignorance of its character can be indulged, for everybody is conclusively presumed to know the law. Under such circumstances, on refusal of delivery upon demand and tender of the amount actually due, the owner has a right of action and the carrier is liable to him for any loss that may occur within the period of wrongful detention, because it is wrongful and outside of the contract. Hutchinson on Carriers, sec. 805.

If there is ground for reasonable doubt as to whether charges are proper, detention of the goods by the carrier pending an adjustment thereof and determination of the proper amount, does not constitute a conversion, so as to render the carrier liable for the value. Moore on Carriers, p. 280; *Hett* v. *Railroad Co.,* 44 Atl. 910; *Robinson* v. *Burleigh,* 5 N. H. 225; *Fletcher* v. *Fletcher,* 7 N. H. 452; *Vaughan* v. *Watt,* 6 M. & W. 492; *Hollins* v. *Fowler,* L. R. 7 H. L. 757,

766. But, if the carrier has no lien for the charges for which he detains, he is liable in trover and conversion for detention after demand for the goods. *Chandler* v. *Weldon*, 18 Johnson (N. Y.) 157; *Judy* v. *Kent*, 52 Johnson Cases, (N. Y.) 407. ''Where the carrier wrongfully refuses to deliver the goods, it is liable as for a conversion, and the measure of damages is the same as in any other case of conversion, namely, the value of the goods in the condition they were in at the time of conversion, together with damages for the wrongful conversion by way of compensation for the loss of use of the goods, or legal interest from the date of the conversion less the freight charges.'' Moore on Carriers, p. 611. Of course, the demand must be accompanied by a tender of. any lawful charges constituting a lien on the goods, unless it is excused or rendered useless by the conduct of the carrier.

As the property was evidently not called for after its second arrival at Erbacon, earlier than Aug. 10, 1914, and the loss may have occurred between July 10, 1914 and that date, it is necessary to determine whether the carrier's liability was absolute or qualified during that period. If the owner was not advised of its arrival nor bound to be at Erbacon awaiting it, the situation of the property throughout that period was a direct result of the original wrongful act, wherefore the liability would necessarily be absolute. Sometime after the first arrival, the property was demanded. Even though Messenger's testimony to the effect that he called for it more than once at Erbacon should be disregarded, it is clear that Belknap himself went to Sutton for it, when advised of its presence there. Then, if not before, the carrier had notice of the owner and of the mistake, through its agent, and so became obligated to return the property to its destination. There is no proof that the owner was advised of the probable date of the second arrival or delivery. Hence, it is manifest that he was under no duty to be at Erbacon awaiting its arrival. The rule announced in *Hurley* v. *Railroad Co.*, 68 W. Va. 471, *Hutchinson* v. *Express Co.*, 63 W. Va. 128 and *Berry* v. *Railway Co.* 44 W. Va. 538, making it the duty of the consignee to call for his goods in a reasonable time after their arrival, does not apply, because, under such

circumstances, he has no means of knowing the probable date of arrival. Ordinarily, he has notice of the date of shipment and, if he does not, the fault is his, and he is bound to know the usual period of transit. In this instance, it was the duty of the carrier to advise him of the date of shipment, at the least. It was a transaction between the carrier and the owner, not one between the owner and a third party, in which the carrier's obligation extended only to acceptance, transportation and delivery. Here, it had wrongful possession of the property and was bound to return it. It was not acting as a mere carrier.

While proof of tender of the legal charges, or excuse for non-tender thereof, is, like the evidence as to most of the other material facts ragged and indefinite, it cannot be doubted that sometime between Aug. 10 and Aug. 31, the owner applied for his property and was ready and willing to pay such charges, nor that the defendant knew it, nor that it insisted upon payment of the illegal charges. He had to get a statement from the agent at Sutton and carry it to Grafton, before any reduction was made, and, as late as Sept. 10, 1914, he took advice from his attorneys as to the mode of procedure for recovery of possession of his property. Known unwillingness to accept what is due, if tendered, excuses actual production of the money, *Koon* v. *Snodgrass,* 18 W. Va. 325; *Shank* v. *Groff,* 45 W. Va. 543.

In view of the clear, full and practically uncontradicted proof of the loss of the articles enumerated in the bill of particulars, as having been lost, and the damages to the residue of the property, and of liability for the cartage or demurrage charge and the expense of reloading, making an aggregate exactly equal to the amount of the verdict, any errors that may have been committed in the admission of improper evidence or the giving of instructions for the plaintiff, are obviously harmless. Admission of proof of loss of profits derivable from the contract with Taylor and Messenger and the giving of an instruction based on it, may have been erroneous acts and likely were, but the errors, if any, were innocuous. No verdict other than that found and returned would be consistent with the law and the evidence. Under such circum-

stances, errors in rulings on the trial are deemed not to have been prejudicial. *Reilly* v. *Nicoll*, 72 W. Va. 189; *Wiggin* v. *Dillon*, 66 W. Va. 313.

The judgment will be affirmed.

*Affirmed.*