# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

McMASTER v DTE ENERGY COMPANY

Docket No. 162076. Argued January 12, 2022 (Calendar No. 2). Decided July 1, 2022.

Dean McMaster brought a negligence action in the Oakland Circuit Court against DTE Energy Company, Ferrous Processing and Trading Company (Ferrous), and DTE Electric Company (DTE), seeking compensation for injuries he sustained when a metal pipe fell out of a scrap container and struck him in the leg. DTE, the shipper, contracted with Ferrous to sell scrap metal generated by its business. As part of the deal, Ferrous placed its large metal roll-off containers at various DTE facilities, and DTE filled the containers with pieces of scrap metal. Ferrous, in turn, subcontracted with P&T Leasing Company (P&T), the carrier, to transport the containers between DTE and Ferrous. McMaster worked as a truck driver for P&T; he picked up containers from DTE and transported them to a Ferrous scrap yard. In October 2014, McMaster arrived at a DTE facility to drop off an empty container and pick up one that DTE had loaded. McMaster inspected the container and saw a large blue steel pipe, approximately the length of the container's width, lying parallel to and up against the back door of the container. McMaster secured the container to his trailer and headed to Ferrous's facility. At the Ferrous scrap yard, McMaster drove to the dumping location as instructed by Ferrous's inspector. He began the typical process of dumping the scrap by getting out of his truck and walking to the back of the trailer that held the container. As was customary, McMaster edged open the container door to ensure that no materials fell out. When nothing fell out, he proceeded to pull the safety chain to fully open the door. After about five minutes, the inspector determined that the scrap should be placed in a different area. McMaster then began to walk toward the front of the truck. At that point, the pipe fell out of the container, hitting McMaster in the back of his left leg and ultimately resulting in a below-the-knee amputation. McMaster brought this action, alleging negligent loading and failure to warn of improper loading. To support his theory, McMaster retained trucking industry expert Larry Baareman, who testified that the orientation of the blue pipe parallel to and up against the container door was hazardous. DTE and Ferrous moved for summary disposition, and the trial court, Cheryl A. Matthews, J., granted the motion as to DTE but denied the motion as to Ferrous. McMaster settled with Ferrous and appealed with regard to DTE. The Court of Appeals, JANSEN, P.J., and METER and STEPHENS, JJ., affirmed in an unpublished per curiam opinion issued November 8, 2018 (Docket No. 339271) (*McMaster I*), reasoning that DTE did not have a duty to warn of or protect McMaster from a known danger, relying on the open and obvious danger doctrine. McMaster sought leave to appeal in the Supreme Court, and the Supreme Court peremptorily vacated Part III of the opinion and remanded the case to the Court of Appeals for

consideration of DTE's legal duty under the law of ordinary negligence. 504 Mich 967 (2019). On remand, the Court of Appeals again affirmed the trial court in an unpublished per curiam opinion issued July 2, 2020 (Docket No. 339271) (*McMaster II*), this time reasoning that Michigan's adoption of federal motor carrier safety regulations at MCL 480.11a of the Motor Carrier Safety Act (the MCSA), MCL 480.11 *et seq.*, abrogated DTE's common-law duty to McMaster or, in the alternative, that the "shipper's exception" set forth in *United States v Savage Truck Line, Inc*, 209 F2d 442, 445 (CA 4, 1953), applied to bar McMaster's claim. McMaster again sought leave to appeal in the Supreme Court, and the Supreme Court granted the application. 507 Mich 958 (2021).

In a unanimous opinion by Justice CAVANAGH, the Supreme Court *held*:

Michigan's adoption of the federal motor carrier safety regulations did not abrogate the common-law duty of care shippers owe to carriers; however, under Michigan common law and consistently with the shipper's exception, a shipper responsible for loading cargo is not liable in negligence for a defect in loading that is apparent to the carrier or its agents, but is instead only liable if the defect is hidden. Accordingly, summary disposition for DTE was affirmed; there was no genuine issue of material fact—DTE was not liable to McMaster because, even assuming that DTE was negligent in how it loaded the container, the defect was not hidden given McMaster's admission that he had seen the pipe's position in the container before he transported it and when he cracked the container door open after transport. Further, McMaster's theory that the pipe's placement on top of concealed materials was a latent defect lacked evidentiary support.

1. The MCSA adopted into Michigan law the federal motor carrier safety regulations under 49 CFR 392.9. The MCSA contains no unequivocal statement that the common law has been abrogated. The Court of Appeals erroneously concluded that the MCSA occupied the field of discernable duties. While the MCSA describes the duties of carriers and drivers in detail, the MCSA does not define the duties of shippers as to their responsibility for loading cargo and therefore does not occupy the field of duties owed by shippers. The Court of Appeals' reasoning was also inconsistent with the underlying premise that the shipper owes a duty of reasonable care at common law. To the extent that the Court of Appeals' reasoning suggested that duties of shippers and carriers to ensure safe transport could not overlap, it failed to consider Michigan's comparative-fault system, in which one party's failure to use ordinary care may reduce the other party's liability without wholly absolving them of it. Accordingly, the MCSA did not repeal the common law, either explicitly or through occupation of the field.

2. The shipper's exception set forth in *Savage*, 209 F2d at 445, was formally adopted: when the shipper assumes the responsibility of loading, the general rule is that it becomes liable for the defects that are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier, but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper. The *Savage* rule properly delineates the duties of shippers and carriers and is consistent with Michigan's common law, Michigan's comparative-fault regime, and the MCSA. The rule is also consistent with considerations governing whether a legal duty exists, including foreseeability of the harm, degree of certainty of injury, closeness of connection between the conduct and injury, moral blame attached to the conduct, the policy of preventing future harm, and the burdens and consequences of imposing a duty and the resulting liability for breach. Given the responsibilities outlined in the MCSA, the *Savage* rule properly

recognizes that a carrier and its drivers are generally in the best position to foresee harm, with limited exceptions, such as latent defects. The shipper is in the best position to know of latent defects caused while the goods were within its exclusive control. The rule also accords with Michigan common law in that a common carrier is the default insurer of damages to goods. Further, the rule is consistent with the federal regulations codified in the MCSA and reflects the balance of responsibilities in the trucking industry. Adoption of the *Savage* rule was not a wholesale adoption of *Savage* and its discussion of the concepts of contributory negligence. The adopted rule does not allow a shipper to wholly escape liability, as might be possible under a contributory-negligence framework. Instead, the shipper's exception defines when liability will attach to the shipper. A shipper may be liable for negligent loading only when it assumes responsibility for loading and there is a latent defect. Moreover, even in circumstances under which the carrier has some degree of fault, the shipper may still be held liable. In other words, the carrier's negligence does not extinguish liability for the shipper, but the jury could reduce the recovery amount when allocating comparative fault. Such a state of events is exactly what is contemplated by a comparative-fault system—multiple, potentially overlapping duties, with only some breaches giving rise to liability.

3. DTE was properly granted summary disposition because there existed no genuine issue of material fact. To establish a prima facie case of negligence, a plaintiff must prove the existence of a legal duty, the defendant's failure to exercise ordinary care in the performance of that duty, and harm proximately caused by the breach of that duty. In this case, DTE owed McMaster a duty of reasonable care, and Michigan's adoption of the federal motor carrier safety regulations at MCL 480.11a did not abrogate that duty. Further, under the adopted rule, liability for a shipper that is responsible for loading may arise only if there is a latent defect. McMaster's theory of liability was that the blue pipe was improperly loaded parallel to the back of the container. But even assuming that it was negligent to load the pipe in this manner, the placement of the pipe was not a latent defect. McMaster admitted in his deposition that during his safety inspections he saw that the large blue pipe was loaded such that it was parallel to and up against the rear door of the container. He also testified that the position of the pipe did not cause him any concern at that time. Finally, McMaster testified that when he began the unloading process at the Ferrous facility, he cracked open the rear door of the container to see whether any material would fall out and again observed the blue pipe in the back of the container. Because the placement of the pipe that caused the injury was readily observable to McMaster—and, in fact, was observed by McMaster—no reasonable jury could conclude that DTE breached its duty to him. McMaster's additional argument—that the fact that the pipe was loaded on top of other concealed materials was a latent defect that made the pipe more susceptible to rolling out of the container—was too speculative to defeat summary disposition.

Affirmed on alternate grounds.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED July 1, 2022

STATE OF MICHIGAN

SUPREME COURT

DEAN McMASTER,

      Plaintiff-Appellant,

v                                           No. 162076

DTE ENERGY COMPANY and FERROUS
PROCESSING AND TRADING
COMPANY, doing business as FERROUS
PROCESSING & TRADING CO.,

      Defendants,

and

DTE ELECTRIC COMPANY,

      Defendant-Appellee.

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

This case concerns the duties of shippers, common carriers, and drivers in the trucking industry. The issue presented is whether and when shippers may be held liable for damage to persons and property. The Court of Appeals determined that the common-law duty of a shipper was abrogated by Michigan's passage of MCL 480.11a, which adopted the federal motor carrier safety regulations as part of the Motor Carrier Safety Act (the MCSA), MCL 480.11 *et seq*. We disagree and hold that the common-law duty of care owed by a shipper to a driver was not abrogated by MCL 480.11a. As an issue of first impression, we adopt the "shipper's exception" or "*Savage* rule"[1] to guide negligence questions involving participants in the trucking industry, as this rule is consistent with our laws—including Michigan's comparative-fault paradigm. A shipper responsible for loading cargo may be held liable for injury to persons or property only for hidden defects—those not readily observable by the carrier or its agents. See *United States v Savage Truck Line, Inc*, 209 F2d 442, 445 (CA 4, 1953). Finally, we apply this rule and affirm, on alternate grounds, the grant of summary disposition to DTE Electric Company (DTE) because there exists no genuine issue of material fact that DTE did not breach its duty to plaintiff.

## I. FACTS AND PROCEDURAL HISTORY

This is a negligence action seeking compensation for injuries caused when a metal pipe fell out of a scrap container, striking plaintiff, Dean McMaster, in the leg. Defendant DTE, the shipper, contracted with Ferrous Processing and Trading Company (Ferrous) to sell scrap metal generated by its business. As part of the deal, Ferrous placed its large

---

[1] *United States v Savage Truck Line, Inc*, 209 F2d 442, 445 (CA 4, 1953).

metal roll-off containers at various DTE facilities, and DTE filled the containers with pieces of scrap metal. Ferrous, in turn, subcontracted with P&T Leasing Company (P&T), the carrier, to transport the containers, or boxes, between DTE and Ferrous. McMaster worked as a truck driver for P&T doing just that—picking up containers from DTE and transporting them to a Ferrous scrap yard.

In October 2014, McMaster arrived at DTE's Belle River Power Plant to drop off an empty container and pick up one that had been loaded by DTE. McMaster inspected the container and saw a large blue steel pipe, approximately the length of the box's width, lying parallel to and up against the back door of the container. He observed that the cargo consisted of heavy materials below the top of the box and determined that no tarp was necessary for the trip. McMaster then used his trailer's hydraulic system to lift the roll-off container onto the trailer, secured the container to the trailer, and headed to Ferrous's Pontiac facility.

At the Ferrous scrap yard, McMaster had the truck weighed, drove to the inspection area, and then drove to the dumping location as instructed by Ferrous's inspector. He began the typical process of dumping the scrap by getting out of his truck and walking to the back of the trailer that held the container. As was customary, McMaster kept the hydraulics running while he edged open the container door about 12 inches to ensure that no materials fell out. When nothing fell out, he proceeded to pull the safety chain to fully open the door. McMaster observed that the majority of the load contained I-beams. With the Ferrous inspector and another Ferrous employee, McMaster then stood 8 or more feet behind and in view of the open container to discuss where to dump its contents. After about five minutes, the inspector determined that the scrap should be placed in a different area.

3

McMaster then began to walk toward the front of the truck to turn off the hydraulics, which wouldn't be needed until the container was moved to the new area for dumping. At that point, the pipe fell out of the container, hitting McMaster in the back of his left leg and ultimately resulting in a below-the-knee amputation.

In June 2015, McMaster sued DTE and Ferrous for negligence, alleging negligent loading and failure to warn of such improper loading. To support his theory, McMaster retained trucking industry expert Larry Baareman, who testified at a discovery deposition that DTE loaded the scrap in a dangerous manner. More specifically, Baareman opined that the orientation of the blue pipe parallel to and up against the container door was hazardous. Further, Baareman testified that the pipe being loaded on top of other material that was concealed underneath was a hidden defect that made the pipe more susceptible to falling off the truck. Baareman concluded that this positioning could have caused the pipe to roll off.

DTE and Ferrous moved for summary disposition under MCR 2.116(C)(10). The trial court granted DTE's motion, stating:

> After considering the legal arguments made by counsel and in looking at the evidence in the light most favorable to the plaintiff, the Court concludes that there's no genuine issue of material fact that exists that would allow reasonable minds to differ in concluding that DTE did not breach the duty of reasonable care owed to plaintiff.
>
> Further, the Court concludes that plaintiff has not sustained his burden as to causation and there's no genuine issue of any material fact remaining as to the elements of negligence analysis.

The trial court denied the motion against Ferrous, and the case continued; McMaster ultimately settled with Ferrous, who is not a party to this appeal. McMaster appealed the

final order disposing of the case, and the Court of Appeals affirmed. *McMaster v DTE Energy Co*, unpublished per curiam opinion of the Court of Appeals, issued November 8, 2018 (Docket No. 339271) (*McMaster I*). The Court of Appeals reasoned that DTE did not have a duty to warn of or protect McMaster from a known danger, relying on the open and obvious danger doctrine. *Id*. at 3-4. McMaster appealed in this Court. Because the Court of Appeals erroneously applied open-and-obvious principles to an ordinary-negligence case, we peremptorily vacated Part III of the opinion and remanded for "application of the law of ordinary negligence and for consideration of the issues raised by the parties on the question of the defendant's legal duty." *McMaster v DTE Electric Co*, 504 Mich 967, 967 (2019).

On remand, the Court of Appeals again affirmed the trial court, this time reasoning that Michigan's passage of MCL 480.11a abrogated DTE's common-law duty or, in the alternative, that the shipper's exception or *Savage* rule[2] applied to bar McMaster's claim. *McMaster v DTE Energy Co*, unpublished per curiam opinion of the Court of Appeals, issued July 2, 2020 (Docket No. 339271) (*McMaster II*), pp 5-6.

McMaster appealed, and our June 2021 order granting leave asked the parties to address "(1) whether the enactment of MCL 480.11a abrogated the appellee's common-law duty of ordinary care with respect to loading cargo for transport by a commercial motor vehicle operated by the appellant; and (2) whether the appellee owed a duty to the appellant under the 'shipper's exception.' See *United States v Savage Truck Line, Inc*, 209 F2d 442, 445 (CA 4, 1953)." *McMaster v DTE Energy Co*, 507 Mich 958, 958 (2021).

---

[2] *Savage*, 209 F2d at 445.

## II. STANDARD OF REVIEW

A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). The court must consider all evidence submitted by the parties in the light most favorable to the party opposing summary disposition. *Id*. Only when the record does not leave open an issue upon which reasonable minds might differ may a motion under MCR 2.116(C)(10) be granted. *Id*. On appeal, the trial court's determination on a motion for summary disposition is reviewed de novo. *Id*. at 159. So too are issues of statutory interpretation, including whether the common law has been abrogated by statute. *Murphy v Inman*, 509 Mich ___, ___; ___ NW2d ___ (2022) (Docket No. 161454); slip op at 6.

## III. ANALYSIS

To establish a prima facie case of negligence, a plaintiff must prove the existence of a legal duty, the defendant's failure to exercise ordinary care in the performance of that duty, and harm proximately caused by the breach of that duty. *Clark v Dalman*, 379 Mich 251, 260; 150 NW2d 755 (1967). Duty and its breach are the focus of our inquiry in this case.

## A. COMMON-LAW ABROGATION

Our first question is whether the MCSA supplanted the common-law duty of care owed by a shipper such as DTE to a driver such as McMaster in the loading of cargo for transport. We conclude that it did not.

During its first review of the case, the Court of Appeals determined that McMaster, as an employee of a subcontractor, was owed a duty of reasonable care by DTE. *McMaster I*, unpub op at 3 (describing "the duty 'imposed by law' " as " '[t]he general

6

duty of a contractor to act so as not to unreasonably endanger the well-being of employees of either subcontractors or inspectors, or anyone else lawfully on the site of the project' "), quoting *Clark*, 379 Mich at 261-262. However, on remand the Court of Appeals determined that the common-law duty of reasonable care had been abrogated by the Legislature's adoption of the MCSA. *McMaster II*, unpub op at 5. McMaster argues that the common-law duty of ordinary care coexists with the MCSA and that there was no abrogation. DTE argues that there is no common-law duty, but regardless, that any duty was abrogated by the MCSA.

As a threshold matter, we agree with McMaster and the Court of Appeals that there is a common-law duty of ordinary care in this context. It is well established that "every person engaged in the prosecution of any undertaking [owes] an obligation to use due care, or to so govern his actions as not to unreasonably endanger the person or property of others." *Clark*, 379 Mich at 261. "This rule of the common law arises out of the concept that every person is under the general duty to so act, or to use that which he controls, as not to injure another." *Id*. See also *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 169-170; 809 NW2d 553 (2011). As the Court of Appeals correctly observed, under these facts, with a subcontractor, McMaster, on DTE's premises with its permission, DTE owed McMaster a duty of reasonable care. The question that remains is whether the MCSA abrogated this common-law duty.

As we most recently discussed in *Murphy*, several principles guide whether this Court will deem the common law abrogated by statute:

> Having concluded that corporate directors owe their shareholders certain fiduciary duties under this state's common law, this Court, as "the principal steward of Michigan's common law," [*Price v High Pointe Oil Co,*

7

*Inc*, 493 Mich 238, 258; 828 NW2d 660 (2013) (quotation marks and citation omitted),] must determine whether the Legislature abrogated these duties when it enacted the [Business Corporation Act, MCL 450.1101 *et seq*.]. "The common law remains in force until 'changed, amended or repealed.' " [*Velez v Tuma*, 492 Mich 1, 11; 821 NW2d 432 (2012), quoting Const 1963, art 3, § 7.] The Legislature may alter or abrogate the common law through its legislative authority. [*Rafaeli, LLC v Oakland Co*, 505 Mich 429, 473; 952 NW2d 434 (2020); Const 1963, art 4, § 1.] Yet the mere existence of a statute does not necessarily mean that the Legislature has exercised this authority. We presume that the Legislature "know[s] of the existence of the common law when it acts." [*Wold Architects & Engineers v Strat*, 474 Mich 223, 234; 713 NW2d 750 (2006).] Therefore, we have stated that "[w]e will not lightly presume that the Legislature has abrogated the common law" and that "the Legislature should speak in no uncertain terms when it exercises its authority to modify the common law." [*Velez*, 492 Mich at 11-12 (quotation marks and citations omitted).] As with other issues of statutory interpretation, the overriding question is whether the Legislature intended to abrogate the common law. [*Hoerstman Gen Contracting, Inc v Hahn*, 474 Mich 66, 74; 711 NW2d 340 (2006) ("Whether a statutory scheme . . . preempts the common law is a question of legislative intent.").]. [*Murphy*, 509 Mich at ___; slip op at 16-17.]

The MCSA is designed, *inter alia*, "to promote safety upon highways open to the public by regulating the operation of certain vehicles" and "to provide consistent regulation of these areas . . . ." 1963 PA 181, title. As is evident from its title, the MCSA addresses safety in the Michigan trucking industry. In furtherance of those goals, the MCSA adopted several provisions of Title 49 of the Code of Federal Regulations. MCL 480.11a. Germane to our purposes, the MCSA adopted into Michigan state law the federal motor carrier safety regulations under 49 CFR 392.9. MCL 480.11a(1)(b). 49 CFR 392.9 relates to the "[i]nspection of cargo, cargo securement devices and systems" and describes responsibilities for motor carriers and their drivers with regard to the cargo they transport. The statute imposes certain duties on the driver of the cargo to ensure that the cargo is properly secured through inspection and reexamination during the course of the trip. Those

duties may be excused under extenuating circumstances, such as a directive not to inspect or impracticability. 49 CFR 392.9 provides, in relevant part:

(a) *General.* A driver may not operate a commercial motor vehicle and a motor carrier may not require or permit a driver to operate a commercial motor vehicle unless—

(1) The commercial motor vehicle's cargo is properly distributed and adequately secured as specified in §§ 393.100 through 393.136 of this subchapter.

\* \* \*

(b) *Drivers of trucks and truck tractors.* Except as provided in paragraph (b)(4) of this section, the driver of a truck or truck tractor must—

(1) Assure himself/herself that the provisions of paragraph (a) of this section have been complied with before he/she drives that commercial motor vehicle;

(2) Inspect the cargo and the devices used to secure the cargo within the first 50 miles after beginning a trip and cause any adjustments to be made to the cargo or load securement devices as necessary, including adding more securement devices, to ensure that cargo cannot shift on or within, or fall from the commercial motor vehicle; and

(3) Reexamine the commercial motor vehicle's cargo and its load securement devices during the course of transportation and make any necessary adjustment to the cargo or load securement devices, including adding more securement devices, to ensure that cargo cannot shift on or within, or fall from, the commercial motor vehicle. Reexamination and any necessary adjustments must be made whenever—

(i) The driver makes a change of his/her duty status; or

(ii) The commercial motor vehicle has been driven for 3 hours; or

(iii) The commercial motor vehicle has been driven for 150 miles, whichever occurs first.

(4) The rules in this paragraph (b) do not apply to the driver of a sealed commercial motor vehicle who has been ordered not to open it to inspect its

cargo or to the driver of a commercial motor vehicle that has been loaded in a manner that makes inspection of its cargo impracticable.

As an initial matter, it is plain from the statute's text that the MCSA contains no unequivocal statement that the common law has been abrogated. In determining that the common law was nonetheless abrogated, the Court of Appeals compared the case to *Dawe v Dr Reuven Bar-Levav & Assoc, PC*, 485 Mich 20; 780 NW2d 272 (2010). *McMaster II*, unpub op at 4-5. *Dawe* concerned whether a statute codifying a psychiatrist's duty to warn or protect third parties abrogated the psychiatrist's common-law special-relationship duty to protect their patients. *Dawe*, 485 Mich at 25. The lower court in *Dawe* had found that the statute at issue preempted the field on the mental health professional's duty to warn others. *Id*. But our Court rejected this analysis, holding that the psychiatrist's common-law duty was not completely abrogated because the statute in question only addressed one aspect of a psychiatrist's duties to patients. *McMaster II*, unpub op at 4. The Court of Appeals in this case distinguished *Dawe* on the basis that, unlike the many duties owed by a psychiatrist to their patient, no other tort duties flow from a shipper to a carrier and, therefore, the MCSA occupied the field of discernable duties. *Id*. at 4-5. But the MCSA addresses the duties of drivers, not shippers—so it cannot be said that the field of duties owed by a shipper has been occupied. The Court of Appeals' reasoning is also inconsistent with the underlying premise that the shipper owes a duty of reasonable care at common law.

The panel also made comparisons to *Velez*, in which we held that the Legislature did not intend to abolish the common-law setoff rule in joint and several liability medical malpractice cases. *Velez*, 492 Mich at 12. This Court reasoned in *Velez* that despite the

10

repeal of a statute acknowledging the common law, the legislation in question was silent as to the application of the common-law rule, and there was no conflict between the common law and legislation. *Id*. The Court of Appeals determined that unlike in *Velez*, there were no other statutes addressing the manner of loading cargo or setting forth a relevant duty. *McMaster II*, unpub op at 5. Again, this reasoning fails to acknowledge the panel's own premise that a common-law duty existed. It also puts the cart before the horse—searching for an intent to maintain the common law when the critical inquiry is whether there was an intent to abrogate it.

To the extent that the Court of Appeals' reasoning suggests that duties of shippers and carriers to ensure safe transport cannot overlap, it fails to consider Michigan's comparative-fault system, in which one party's failure to use ordinary care may reduce the other party's liability without wholly absolving them of it. See *Placek v Sterling Hts*, 405 Mich 638; 275 NW2d 511 (1979); MCL 600.2957. Nothing in the common law or the MCSA indicates that the duties of shippers and carriers are a zero-sum game such that if one has the duty to ensure safe transport, the other does not.

DTE argues that the highly detailed and comprehensive course of conduct set forth in the MCSA supports a reading of abrogation. See *Millross v Plum Hollow Golf Club,* 429 Mich 178, 183; 413 NW2d 17 (1987) (providing that legislative intent to replace the common law may be found "where comprehensive legislation prescribes in detail a course of conduct to pursue and the parties and things affected, and designates specific limitations and exceptions"). In a similar vein, the Court of Appeals suggested that the MCSA occupied the field of duties owed by a shipper to a carrier. *McMaster II*, unpub op at 5. However, while the MCSA describes the duties of carriers and drivers in detail, the MCSA

11

does not define the duties of shippers as to their responsibility for loading cargo. The shipper's role within the universe of the trucking industry is, of course, contemplated by the MCSA, which defines a "shipper" such as DTE, 49 CFR 390.5, and prohibits shippers from coercing a driver to haul an unsafe load in violation of the regulations, 49 CFR 386.12(c); 49 CFR 390.6. But the MCSA, which regulates "all employers, employees, and commercial motor vehicles that transport property or passengers in interstate commerce," 49 CFR 390.3(a), does not occupy the entire field of liability questions regarding shippers in this industry. It is not fully comprehensive on the question of negligence because it does not speak to the shipper's duties in loading cargo—at all. Legislative silence as to the shipper's duties in this realm is not indicative of abrogation. In sum, the MCSA did not repeal the common law, either explicitly or through occupation of the field.

## B. CONTOURS OF THE DUTY OWED

Having decided that the shipper's common-law duty was not abrogated by the adoption of the MCSA, we address the contours of the shipper's common-law duty of care to the carrier and its drivers. We take this opportunity to formally adopt the "shipper's exception" as described in *Savage*, 209 F2d at 445:

> When the shipper assumes the responsibility of loading, the general rule is that [it] becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper.

We find that the *Savage* rule properly delineates the duties of shippers and carriers and that this rule is consistent with our common law, with our comparative-fault regime, and with the MCSA.

12

In *Savage*, the defendant was a common carrier that had contracted with the federal government to transport a truck with a cargo of six airplane engines in cylindrical containers. *Id*. at 443. At some point during the transport, the cylinders shifted, and one fell off the truck, killing another motorist. *Id*. The way that the government's agents loaded the cylinders had caused the cargo to jostle while being transported. *Id*. at 443-444. On appeal, the government argued that despite the finding of negligence on its part in loading the truck, it was still entitled to recover damages to the engines from the defendant because of the liability owed by a common carrier to a shipper. *Id*. at 444.

The United States Court of Appeals for the Fourth Circuit recognized that the "common law liability of a common carrier is that of an insurer for loss or damage of goods in transit . . . ." *Id*. at 445. But the carrier's liability does not reach "losses arising from acts of God, acts of the public enemy, the inherent nature of the goods, and acts of the shipper." *Id*. The court noted that "the duty rests upon the carrier to see that the packing of goods received by it for transportation is such as to secure their safety," and that the duty of every common carrier is "to furnish adequate facilities for the transportation of property and to establish and enforce just and reasonable regulations and practices relating to the manner of packing and delivering goods for transportation[.]" *Id*. This duty was derived from federal regulations, which stated at the time that "the load on every motor vehicle transporting property shall be secured in order to prevent unsafe shifting of the load and that no motor vehicle shall be driven unless the driver shall have satisfied himself that all means of fastening the load are securely in place." *Id*. The Fourth Circuit concluded that "[t]he primary duty as to the safe loading of property is therefore upon the carrier." *Id*. The court went on to explain:

13

When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper. This rule is not only followed in cases arising under the federal statutes by decisions of the federal courts but also for the most part by the decisions of the state courts. [*Id*.]

The court observed that both parties were negligent: the government's agents failed to secure the engines properly when loading the cargo, and the carrier's agents failed to use reasonable care in accepting the load as loaded as well as failed to operate the vehicle with ordinary care in light of the known deficiencies in loading and securing the cargo. *Id*. at 446. The court reasoned, "Obviously it was [the driver's] duty, having this knowledge, to drive with particular attention to the speed of the vehicle but he conducted himself as if conditions were normal and the catastrophe ensued." *Id*. Thus, under the rule it set out, the carrier was not entitled to recover from the government for damages to his truck, but the government was entitled to recover from the carrier for the damage to its cargo. *Id*.

The default rule, then, is that a carrier and its drivers will generally shoulder responsibility for issues stemming from the loading of cargo. Only when the shipper assumes the responsibility of loading and there are hidden defects may the shipper be held responsible—even if the shipper negligently loads the cargo. The "shipper's exception" initially pertained only to the damage of goods during shipment but has been extended to the personal-injury context in which employees or contractors of carriers are injured because of allegedly negligent loading. See *Decker v New England Pub Warehouse, Inc*, 749 A2d 762, 767; 2000 ME 76 (2000).

The Court of Appeals held, in the alternative to common-law abrogation, that the "shipper's exception" applied. *McMaster II*, unpub op at 5. The panel reached this

conclusion in part because it presumed that the Legislature knew about the *Savage* case, which preceded Michigan's enactment of the MCSA. *Id.* While we agree that the *Savage* rule defines the scope of the duty question, we disagree that the mere existence of federal common law from the United States Court of Appeals for the Fourth Circuit bears on the question of legislative intent with regard to the continued vitality of Michigan common law. We do not impute knowledge of federal common law to the Michigan Legislature. Nevertheless, we hold that the *Savage* rule is consistent with preexisting Michigan law, including our comparative-fault system.

The *Savage* rule accords with our recognition of the liability of common carriers at common law. A common carrier is generally liable for damages to goods, with narrow exceptions including the "fault of the owner." *Black v Ashley*, 80 Mich 90, 96; 44 NW 1120 (1890). In other words, the common carrier is the default insurer. *Id.* The descriptions of the "fault of the owner" in *Black*, *id.*, and the "acts of the shipper" in *Savage*, 209 F2d at 445, indicate a shared understanding that the default rule contained narrow exceptions reflecting who had control of the goods and was in a better position to control for risk. The shipper's exception—limiting the scope of the shipper's fault to latent defects—is a natural extension of this shared understanding.

The exception is also consistent with considerations governing whether a legal duty exists, including "foreseeability of the harm, degree of certainty of injury, closeness of connection between the conduct and injury, moral blame attached to the conduct, policy of preventing future harm, and . . . the burdens and consequences of imposing a duty and the resulting liability for breach." *Brown v Brown*, 478 Mich 545, 553; 739 NW2d 313 (2007) (cleaned up). Given the responsibilities outlined in the MCSA, the *Savage* rule properly

15

recognizes that a carrier and its drivers are generally in the best position to foresee harm, with limited exceptions. One such limited exception is latent defects; the shipper is in the best position to know of latent defects caused while the goods were within its exclusive control. This refinement of when a duty will give rise to liability reflects the unique allocation of responsibility in this specialized setting. See *Decker*, 749 A2d at 766-767 ("The *Savage* rule simply extends the industry's reasonable understanding to negligence suits involving carriers and shippers.").

Further, the rule is consistent with the federal regulations codified by Michigan in the MCSA. In turn, these regulations reflect the balance of responsibilities in the trucking industry. For example, the onus is generally on the carrier's driver to ensure that the cargo is secured and distributed properly and to perform safety checks throughout the trip. 49 CFR 392.9. The driver may refuse to accept a load from a shipper if they believe that the cargo is dangerously loaded. 49 CFR 392.9(b)(1). In addition, the regulations excuse a driver from such responsibilities if the driver is unable to inspect the cargo, such as if the container is sealed or if the manner of loading makes inspection impracticable. 49 CFR 392.9(b)(4). These exemptions are wholly consistent with shifting the responsibility for latent defects to shippers, because a driver would be unable to detect them.

McMaster argues that the *Savage* rule is inconsistent with our comparative-fault system.[3] To be sure, the *Savage* court applied its holding in the context of a contributory-

---

[3] We adopted the doctrine of comparative negligence in *Placek*, 405 Mich 638, and the Legislature later codified the state's modified comparative-negligence scheme, MCL 600.2957. After the jury has determined that a party is liable for damages in a tort action, the comparative-fault assessment kicks in for the jury to apportion liability on the basis of the relative fault of the parties. MCL 600.2957; see also M Civ JI 11.01. In contrast to our former contributory-negligence scheme, which we cast aside in *Placek*, an at-fault party

16

negligence framework.  But our adoption of the *Savage* rule is not a wholesale adoption of *Savage* and its discussion of the concepts of contributory negligence.  The rule that we now adopt does not allow a shipper to wholly escape liability, as might be possible under a contributory-negligence framework.   Instead, the shipper's exception defines when liability will attach to the shipper.  A shipper may be liable for negligent loading only when there is a latent defect.  Moreover, even in circumstances under which the carrier has some degree of fault, the shipper may still be held liable.  In other words, the carrier's negligence does not extinguish liability for the shipper, but the jury could reduce the recovery amount when allocating comparative fault.  Such a state of events is exactly what is contemplated by a comparative-fault system—multiple, potentially overlapping duties, with only some breaches giving rise to liability.  Notably, many other states with comparative-fault regimes have also adopted the "shipper's exception."  See, e.g., *Decker*, 749 A2d 762; *Wilkes v Celadon Group, Inc*, 177 NE3d 786 (Ind, 2021); *Smart v American Welding & Tank Co, Inc*, 149 NH 536; 826 A2d 570 (2003).  While not binding, these decisions from our sister jurisdictions have persuasive value.

In summary, we adopt the shipper's exception because it is consistent with our common law, the MCSA, and our system of comparative fault.  A shipper owes a common-law duty to use reasonable care while loading cargo and will be liable for injury to persons or property for defects that are not readily discernible by the carrier.  The carrier still owes a duty to inspect and correct any defects that it can perceive, even if the shipper was the

---

generally may not escape liability by pointing to the plaintiff's own negligence unless the jury determines that the plaintiff's percentage of fault surpasses that of the at-fault party. MCL 600.2959; M Civ JI 11.01.

one who initially caused the defect. When both the shipper and the carrier have acted negligently by breaching their respective duties and proximately causing damage, Michigan's comparative-fault scheme requires a jury to apportion fault between them.

## IV. APPLICATION

Having outlined the nature and extent of DTE's duty to McMaster, we next determine whether McMaster has raised a genuine issue of material fact sufficient to survive a motion for summary disposition. We hold, on the basis of the record presented, that there exists no genuine issue of material fact that the accident was caused by a latent defect and, therefore, that DTE was properly granted summary disposition.

McMaster's theory of liability was that the blue pipe was improperly loaded parallel to the back of the container. But even assuming that it was negligent to load the pipe in this manner, as we must when viewing the evidence in the light most favorable to McMaster, the placement of the pipe was not a latent defect. McMaster admitted in his deposition that during his safety inspections he saw that the large blue pipe was loaded such that it was parallel to and up against the rear door of the container. McMaster testified that he had climbed up a ladder to look inside the container while still at the DTE facility and could see that the pipe was "[i]n the very back up against the back door." He also testified that the position of the pipe did not cause him any concern at that time. Finally, McMaster testified that when he began the unloading process at the Ferrous facility, he cracked open the rear door of the container to see whether any material would fall out and again observed the blue pipe in the back of the container. Accordingly, because the placement of the pipe which caused the injury was readily observable to McMaster—and,

18

in fact, was observed by McMaster—no reasonable jury could conclude that DTE breached its duty to him.

In addition, McMaster argues that the fact that the pipe was loaded on top of other concealed materials was a latent defect that made the pipe more susceptible to rolling out of the container. But this theory is too speculative to defeat summary disposition. When asked whether the material under the pipe played a role in the pipe rolling out of the container, McMaster's proposed expert, Larry Baareman, testified, "I can only say it could have." However, to defeat summary disposition, a plaintiff must do more than present evidence that the defendant's conduct possibly caused the injury. *Skinner v Square D Co*, 445 Mich 153, 164-165; 516 NW2d 475 (1994) ("Nor is it sufficient to submit a causation theory that, while factually supported, is, at best, just as possible as another theory. Rather, the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred."). Given this evidence, there is no genuine issue of material fact either that the allegedly defective loading of the blue pipe was latent or that DTE breached the duty it owed to McMaster.

## V. CONCLUSION

We hold that the adoption of the federal motor carrier safety regulations at MCL 480.11a did not abrogate the common-law duty of care owed by shippers to carriers. Under Michigan common law, consistently with the "shipper's exception" discussed in *Savage*, a shipper is not liable in negligence for a defect in loading that is apparent to the carrier or its agents, but is instead only liable if the defect is hidden. *Savage*, 209 F2d at 445. This

19

duty is consistent with our common law, with our comparative-fault system, and with the everyday experiences in the trucking industry as reflected in the MCSA. Applying this rule to the facts of this case, McMaster has failed to raise a genuine issue of material fact that there was a latent defect that caused his injuries. Therefore, we affirm the Court of Appeals' determination that the trial court's entry of summary judgment to DTE was proper.

Megan K. Cavanagh
Bridget M. McCormack
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Elizabeth M. Welch